

Opinions of the United
States Court of Appeals
for the Third Circuit

9-30-2004

# USA v. Clark

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3066

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Clark" (2004). *2004 Decisions.* Paper 305.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/305

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-3066

UNITED STATES OF AMERICA

v.

TRACY CLARK,

Appellant

No. 03-3073

UNITED STATES OF AMERICA

v.

ANTHONY MILLER,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action Nos. 01-cr-00428-2/1)
District Judge: Honorable Robert F. Kelly

Submitted Under Third Circuit LAR 34.1(a)
September 14, 2004

Before: SCIRICA, Chief Judge, ALITO and AMBRO, Circuit Judges

(Opinion filed September 30, 2004)

AMBRO, Circuit Judge

Appellant Anthony Miller was convicted of possession with intent to distribute in excess of 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a), and sentenced to 360 months imprisonment. Appellant Tracy Clark was convicted of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), and sentenced to 293 months imprisonment. Both convictions were based on evidence that was recovered during the execution of a search warrant at Miller's apartment in Philadelphia on December 8, 1999. Miller and Clark appeal the District Court's denial of their motions to suppress evidence obtained during the search of the apartment. They contend that the warrant authorizing the search was not supported by probable cause and, in the alternative, that the officers executing the search waited an unreasonably short time before forcing entry, violating the "knock-and-announce" principle implicit in the Fourth Amendment.

Miller separately raises two additional issues in his appeal. He asserts that there may have been impeachment material in a confidential personnel file of one of the officers involved in his investigation. By motion of Miller's counsel, the trial judge reviewed the file *in camera* before ruling that he would not compel its discovery because

2

the file's contents were immaterial and could not be entered into evidence. Miller now asks us to review independently the file and make our own ruling regarding its relevance. Finally, Miller charges that the prosecutor of his case made improper and prejudicial statements to the jury in a rebuttal argument, warranting a mistrial.

Because the judge issuing the warrant had a substantial basis for concluding that probable cause existed, and because the manner in which the search was executed was not unreasonable under the circumstances, we affirm the District Court's denial of the motions to suppress the evidence. We decline Miller's invitation to review the materials excluded by the District Court because even if they were to contain the very evidence Miller suspects they might, this would not be enough to cast into doubt the sufficiency of the evidence upon which the jury relied to convict him. Likewise, the prosecutor's comments to which Miller takes exception, even if we were to consider them improper, were too insignificant and too quickly cured to render their inclusion harmful. Accordingly, we affirm the convictions.

## I.      Facts and Procedural History

### A.      Facts

On October 28, 1999, agents of the Pennsylvania Attorney General's Office, Bureau of Narcotics Investigation and Drug Control ("BNI"), received information from a confidential informant ("CI") regarding drug trafficking activity on the 600 block of Creighton Street in Philadelphia. The CI reported that crack cocaine was being sold at

3

this location on a 24-hour-a-day basis. The CI stated that sellers on the corner paged Miller when crack supplies began to run low, and that he would generally arrive within a half hour to resupply them. The CI indicated that Miller drove a cream-colored Lexus and that the drugs he sold were packaged and stored in a residence at the Parkside Village Apartments at Bryn Mawr Avenue and Parkside Avenue.

As a result of this information, BNI agents performed surveillance on the 600 block of Creighton Street on November 8, November 19, and December 1, 1999. On those days, agents observed numerous drug transactions conducted in a nearby alley. They also twice observed Miller resupply the sellers after leaving Apartment 72 of Parkside Village. Subsequent to these observations, the BNI agents applied for a search warrant from a judge of the Court of Common Pleas of Philadelphia, requesting authorization to search Miller's residence for evidence of drug trafficking. An agent submitted an affidavit summarizing the CI's information and the observations made during the surveillance, which, he submitted, established probable cause for the search. The judge agreed that probable cause existed and issued the warrant on December 7, 1999.

On December 8, 1999, at about 5:00 p.m., six BNI agents prepared to execute the search warrant. When the agents, who wore raid gear that was clearly marked "Police," gathered outside the buildings, one of the agents observed someone looking out of the window of Apartment 72. The agents proceeded upstairs, where they knocked on the

4

door and announced "police search warrant." No one responded to this announcement, although agents heard footsteps inside the apartment suggesting that someone was running around and not traveling in the direction of the door. The agents believed that there was a strong possibility that evidence, particularly cocaine, was being destroyed. After waiting approximately 10 seconds, the agents forcibly knocked down the door and entered the apartment.

Miller was inside the apartment together with Clark. Clark attempted to pull a .45 caliber semiautomatic handgun out of his waistband, but was apprehended along with Miller. In Miller's jacket were found 135 packets of crack cocaine. In addition, a wide variety of packaging material and other paraphernalia were recovered throughout the apartment, including amber-colored vials containing crack, many empty packets and vials, and a heat sealer, strainer, and other tools used in packaging narcotics. Other items included a glass bowl in the microwave oven containing white powdery residue, digital scales, blue-tinted ziplock packets of crack, and a coffee grinder containing white powder residue. The total amount of crack recovered was approximately 59.9 grams.

## B. The Motions to Suppress

Prior to trial, Miller and Clark separately moved to suppress evidence obtained in the search of the apartment on two grounds: 1) that the BNI failed to establish probable cause when applying for the search warrant, and 2) that the officers waited an unreasonably short period before forcing entry into the apartment. The District Court

held a hearing on these issues, during which Miller's counsel argued that the probable cause determination had been based entirely on uncorroborated information by a non-credible CI and that the knock-and-announce principle was violated. The District Court denied the motions, ruling that the affidavit submitted with the the application for the warrant supported a finding of probable cause to believe that the narcotics operation on Creighton Street was being supplied from drugs stored in Apartment 72 of Parkside Village. The District Court also ruled that the knock-and-announce principle was not violated, because the manner of the forced entry was not unreasonable under the circumstances. The exigent circumstances that, in the District Court's opinion, rendered the short wait reasonable included: 1) the agents noticing someone look out the window of the apartment, leading them to conclude that the individuals inside the apartment were aware of their presence, and 2) the agents hearing hurried footsteps inside the apartment that were not moving in the direction of the door, leading them to believe that crack, which is easily destroyed, was possibly being destroyed or disposed.

## C.     The Personnel File

During trial, Miller's counsel requested that the Government produce the personnel file of BNI Agent Kenneth Bellis, who testified against Miller. The file contained an internal BNI report on an investigation into alleged misuse of Government property by Agent Bellis. Because the Government represented that the contents of the confidential report were irrelevant to this case, it objected to their discovery by the

defense. At the suggestion of Miller's counsel, both sides agreed that the trial judge would review the report *in camera* to determine whether it was relevant to the defense, and in particular whether it contained anything that would tend to undermine the credibility of Agent Bellis's testimony. The Court reviewed the report *in camera* and ruled that nothing in the file could constitute impeachment material or matter that would assist in cross-examination to attack the credibility of Agent Bellis. Accordingly, it declined to compel discovery of the confidential report.

### D. Prosecutor's Remarks

At the close of Miller's trial, the prosecutor made a rebuttal statement summarizing the evidence presented and asking the jury to return a guilty verdict. On two occasions the defense objected to remarks made by the prosecutor to the jury.[1] In the first objection,

---

[1]The first remark by the prosecutor to which the defense took exception was:

> MR. DOUGLAS: The defense says, well, why didn't they fingerprint him? And the Government would contend, they had the person, you heard the [] testimony that we were focusing on the one person we knew who lived at this address or had access to this address, this defendant. And when they went to that location, what did they find? They found these items. Was there anybody else there? No. *Was there testimony that anybody else lived there? No.*
> (Emphasis added.)

The second remark was:

> MR. DOUGLAS: And when you stop to think and apply your common sense and your life experience to that, you will come up with one conclusion and one conclusion only and that is the same conclusion that the Government is asking you to do and that is *tell Anthony Miller that on*

7

Miller's counsel claimed that the prosecutor was improperly shifting onto the defense the burden of proof on the issue of whose residence was Apartment 72. This, he argued, was an element that formed part of the prosecution's burden. Following a sidebar, the trial judge overruled this objection. In the second objection, moments later, Miller's counsel moved for a mistrial on the ground that the prosecutor had asked the jury to "send a message" by convicting Miller. The trial judge summarily overruled this objection, but also immediately clarified to the jury that "we aren't sending messages. There is one thing you have to do here and decide whether or not the Government has proven over this couple days, that the defendant was guilty of the crime charged in Count 1 of the indictment beyond a reasonable doubt."

## II. Analysis

### A. Probable Cause

Because the District Court's decision that the search warrant was supported by probable cause was based on the facts contained in the search warrant affidavit—the veracity of which Miller and Clark do not challenge—we afford plenary review to their claims of error. *United States v. Burton*, 288 F.3d 91, 97 (3d Cir. 2002). Miller's claim that the affidavit improperly relied on the uncorroborated information of a first-time CI to establish the required nexus between the property to be searched and contraband sought

---

*December 8, 1999, that having all of this was absolutely wrong.*
(Emphasis added.)

8

leaves us scratching our heads. Even a cursory review of the affidavit and the facts surrounding the BNI investigation reveals that, to the contrary, before applying for the warrant the agents actively sought to corroborate the CI's information and to link the drug transactions on Creighton Street to Apartment 72 of Parkside Village. Probable cause is a "practical, common-sense decision" and may be found whenever "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Because the information in the affidavit could reasonably be read to show that there was more than a fair probability that drugs would be found in the apartment, we affirm the District Court's conclusion that the issuing judge's probable cause determination should be upheld. Accordingly, the District Court's refusal to suppress evidence obtained during execution of the search warrant was entirely proper.

**B.     Knock-and-Announce**

Our inquiry into whether the manner in which the agents executed the warrant was consistent with the Fourth Amendment's protection from unreasonable searches is guided by the Supreme Court's recent decision in *United States v. Banks*, 540 U.S. 31, 124 S. Ct. 521 (2003). There the Court reiterated its holdings from previous cases that constitutionality of the manner in which a search is performed is subject to a "totality of circumstances" analysis. *Banks*, 124 S. Ct. at 525. This analysis focuses on reasonableness, a sensible standard when one considers that the Amendment itself relies

9

on the same language. U.S. Const. amend. IV ("The right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated . . . ."). The reasonableness of a warrant's execution turns in significant measure on the significance of the exigency revealed by the circumstances as they are perceived by the officers. In *Banks*, the Supreme Court affirmed the constitutionality of a search remarkably similar to ours. The officers arrived at the home of a suspected cocaine dealer on a weekday afternoon, rapped hard on the door, and called out "police search warrant." Hearing nothing, and waiting for 15 to 20 seconds with no answer, the officers broke open the front door with a battering ram and entered the premises. The Supreme Court emphasized that "what matters is the opportunity to get rid of cocaine, which a prudent dealer will keep near a commode or kitchen sink. The significant [exigent] circumstances include the arrival of the police during the day, when anyone inside would probably have been up and around, and the sufficiency of 15 to 20 seconds for getting to the bathroom or the kitchen to start flushing cocaine down the drain." 124 S. Ct. at 527.

We consider reasonable the 10-second wait in this case even though it is shorter than the 15 to 20 seconds approved in *Banks*. That is because the agents in this case faced the same exigency as in *Banks*, along with two others: their knowledge that someone inside the apartment had already seen them approaching, and their hearing of

10

scurrying footsteps inside the apartment that were not headed in the direction of the door.[2] We therefore affirm the District Court's ruling that, under the facts of this case, the manner in which the search was performed did not violate appellants' Fourth Amendment rights.

### C. The Personnel File

Miller argues that we should independently review the contents of Agent Bellis's personnel file to verify that there was no admissible material in it that could have been used by the defense to undermine Bellis's credibility with the jury. Even assuming such a review is within our jurisdiction—the Government argues that it was waived when Miller's counsel agreed to abide by the outcome of the judge's *in camera* review and did not object when the judge returned with his ruling—we decline to review the file because its contents would not produce a different result at trial. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *United States v. Milan*, 304 F.3d 273, 287 (3d Cir. 2002).

Agent Bellis's testimony to the jury served two functions in the prosecution's case. First, he testified to Miller's presence at Apartment 72 on one of the days of the stakeout, November 19, 1999. While this information may have been important to the initial finding of probable cause to issue the warrant, it did not play a great role, nor does it seem even to have been contested, at trial. The second function of Bellis's testimony was to

---

[2]The Supreme Court noted with approval *United States v. Markling*, 7 F.3d 1309 (7th Cir. 1993), a case where a wait as short as seven seconds was considered reasonable under the totality of circumstances. *Banks*, 124 S. Ct. at 526 n.5.

explain why the agents forcibly broke open the door of the apartment when executing the search warrant. While Miller questions the correctness of that conduct, he does not dispute the factual circumstances leading up to it. As such, even if we were to discover that the personnel file contained admissible information tending to undermine Bellis's credibility, and even if the jury had disbelieved the witness and entirely discounted both aspects of his testimony, it would not be enough to call into question the sufficiency of the evidence upon which the jury could rely to convict Miller. That evidence was overwhelming, and there is no reasonable probability that the outcome of the trial would have been different but for Bellis's testimony.

### D. Prosecutor's Remarks

Miller's contention that the prosecutor's rebuttal comments shifted the burden of proof to the defendant and improperly asked the jury to base its considerations on something other than the evidence is simply meritless. The prosecutor's first remark, that Miller had not shown that anyone else occupied the apartment, was spoken to underscore Miller's failure to support his contention at trial that he did not live in Apartment 72. In that context, the prosecutor was merely highlighting a weakness in the defense's theory rather than shifting any evidentiary burden. The trial judge rightly overruled Miller's objection to the prosecutor's mention of this weakness.

Even more baseless is Miller's contention that the prosecutor urging the jury to tell Miller that having nearly 60 grams of crack cocaine in his apartment "was absolutely

12

wrong" somehow amounted to directing the jury to base its considerations on something other than the evidence. When asking the jury to return a guilty verdict, it is not fitting for a prosecutor to describe a guilty verdict as expressive of the jury's moral disapprobation of a defendant's conduct. But such a rhetorical device was harmless in this case, especially when cured by the judge's immediate admonition to the jury that "[t]here is one thing you have to do here and [that is to] decide whether or not . . . the defendant was guilty of the crime charged in Count 1 of the indictment beyond a reasonable doubt." *See Gov't of V.I. v. Joseph*, 770 F.2d 343, 349 (3d Cir. 1985) (defendant was not prejudiced by prosecutor's closing argument in light of curative jury instruction).

## III. Conclusion

For the reasons stated, we affirm the District Court's denial of appellants' motions to suppress evidence and Miller's motion for a new trial. Accordingly, the convictions of Tracy Clark and Anthony Miller are affirmed.